**Lois Gibson EVERS, Administratrix of the Estate of Paul Mason Evers, Jr., Deceased, Plaintiff,**

**v.**

**STANDARD SECURITY LIFE INSURANCE COMPANY OF NEW YORK, Defendant.**

**Civ. A. No. 70–C–143–R.**

United States District Court,
W. D. Virginia,
Roanoke Division.

July 25, 1972.

Ralph Masinter, Masinter & Masinter, Roanoke, Va., for plaintiff.

William R. Cogar, Mays, Valentine, Davenport & Moore, Richmond, Va., for defendant.

## OPINION and JUDGMENT

DALTON, District Judge.

Heretofore by order of July 12, 1971, this court denied defendant's first motion for summary judgment in its favor. Although in that order, indicating that no basis was observed for the recovery of punitive damages, the court deferred final action on this question. Now the court definitely holds that the claim for punitive damages is ruled out and dismissed.

The record having been completed, the defendant insurance company renews its motion for summary judgment, and as hereinafter stated, is again denied.

## THE FACTS

This is an action to recover the proceeds of a temporary life insurance policy alleged to have been issued by defendant, Standard Security Life Insurance Company of New York on the life of Paul Mason Evers, Jr., plaintiff's deceased. Defendant has moved for summary judgment, denying that it is liable to the plaintiff.

In August 1970 in Roanoke, Virginia, Paul Mason Evers, Jr. submitted a signed application consisting of Parts I and II to the defendant Company for a Preferred Risk Endowment at Age 95 insurance policy for $17,487. Evers named his wife, the plaintiff here, as beneficiary. The policy, which was secured through Evers' employer, was non-medical and no physical examination of the applicant was required. The application was delivered to Arnold P. Masinter, a general agent of the Company, who forwarded the application by mail to the Company in New York on September 3, 1970. An amount equal to one annual premium was paid to Masinter on September 15, and he later sent the premium payment to the Company.

Part I of the application signed by Evers provides, in part:

You and the Owner agree as follows: . . . (2) except as otherwise provided in the Conditional Premium Receipt, *the Company shall incur no liability until a policy has been delivered to and accepted by the Owner* and the full first premium has been paid to and accepted by the Company during Your lifetime and while Your health and other conditions remain as described in both Parts I and II of this application; (Emphasis supplied)

The Conditional Premium Receipt, acknowledging receipt of payment of the initial premium, was attached to Part I. It provided:

IT IS UNDERSTOOD AND AGREED THAT THE DEPOSIT IS PAID AND ACCEPTED, SUBJECT TO THE FOLLOWING CONDITIONS: (1) *If we are satisfied, after any investigations and medical examinations that we may require, that You are insurable at the rate and classification applied for*—and—(2) if Part II of the application is furnished to us—and—(3) if the premium deposit is sufficient to pay, in full, the first premium for the insurance applied for, *then the insurance will become effective on the date of this receipt or on the date of Part II of the application (whichever is later)* unless the applicant requests otherwise. If the premium deposit is not sufficient to pay the full first premium for the insurance applied for, the insurance shall nevertheless become effective as

provided in (3) above and such insurance shall continue in force for that period of time which the premium deposit will cover on a pro-rata basis and shall expire at the end of that period of time unless the balance of the full first premium is paid before then. (Emphasis supplied)

When the deposit was made on September 15, Evers was not issued the Conditional Premium Receipt because it had already been sent to the Company with the application. Defendant concedes that Evers was entitled to the Receipt at the time of the payment; therefore for purposes of this court's consideration, the Receipt shall be treated as having been so issued.

The Company asserts that it began its review of the application on September 17, 1970. Using the medical authorization executed by Evers in Part II of his application, the Company requested an Attending Physician's Statement ("APS") from Evers' physician, Dr. Charles E. Swecker, on the 17th. A second APS was requested from Dr. Swecker on September 29, after he apparently failed to respond to the earlier request.

Evers died in an automobile accident on October 10, 1970, while, according to the company, his application was still under consideration. A death claim was filed with the company by agent Masinter on October 26. One day later the company received Dr. Swecker's report. Later, on November 25, 1970, the company returned the premium deposit to Evers' employer, stating, "We regret to advise that, after consideration of all rele-

vant information, we must decline the application for insurance and deny all liability in connection with the fatal loss sustained on or about October 10, 1970."

### THE LAW APPLICABLE

First, the court will proceed on the basis that the Virginia and New York laws govern the case—both states being substantially in accord.

### THE ISSUES

The issue here is whether in an application for life insurance conditioned for its acceptance upon the insurer's determination of insurability, the insurer, subsequent to applicant's death (but before acceptance of the application) may for any reason reject the application and thereby avoid liability. In other words may the approval clause be invoked in this case? Or, to put it another way, could the insurance company reject the application if the insured was insurable under the rules and practices of the Company?

Defendant argues that this case is controlled by Elliott v. Interstate Life & Accident Ins. Co., 211 Va. 240, 176 S.E. 2d 314 (1970). In *Elliott* the plaintiff's deceased completed the application, the relevant portions of which are set forth in the margin,[1] paid the initial premium, but died before the company's agents had found *Elliott* insurable. The Supreme Court of Virginia held that the company was not liable, noting that the insurer's special agent had no authority to make a preliminary contract of insurance and that the policy itself provided

1. The application stated: It is understood and agreed that: (1) there shall be no liability hereunder until a policy is issued to and received by me and the first premium actually paid during the lifetime of all the Proposed Insureds and their continued good health except as provided in the receipt bearing the same serial number as this application; * * *
The serially numbered receipt referred to in the application contained the following provision:
* * * The insurance under the policy for which application is made shall be

effective on the date that a satisfactory Part II of the application is furnished to the Company or on the date of completion of the medical examination (if and when required by the Company), whichever is the later date, if in the opinion of the authorized Officers of the Company at its Home Office in Chattanooga, Tennessee, the persons proposed for insurance are insurable and acceptable for insurance under the rules and practices on the plan of insurance, for the amount of insurance, and at the premium rate set forth in the application.

that no coverage existed until the application was approved by officers at the home office.

The language in Evers' receipt would be like *Wright* (hereinafter referred to), but unlike *Elliott*, somewhat ambiguous, if it is held that the company can reject his application for any reason. When Evers paid the premium, having completed Part II of the application earlier, he could reasonably assume that he was covered from that date—if he was in fact an insurable risk for the proposed policy by defendant's standards. Wright v. Pilot Life Ins. Co., 379 F.2d 409 at 412 (4th Cir. 1967).

Generally the courts which have construed receipts conditioned upon the applicant's insurability at the date of the application holding that the receipt with an approval clause barred recovery, have done so only where the insurer rejects the application in good faith upon the ground that the applicant was not insurable, at least according to the rules and practices of the company policy. E. g. Scheinman v. Phoenix Mut. Life Ins. Co. of Hartford Conn., 409 F.2d 999 (7th Cir. 1969); Cortez v. Life Ins. Co. of North America, 408 F.2d 500 (8th Cir. 1969); Cliborn v. Lincoln National Life Ins. Co., 332 F.2d 645 (10th Cir. 1964); Palmer v. Mut. Life Ins. Co. of New York, 324 F.Supp. 254 (D.Me.1971), see also 43 Am.Jur.2d, Insurance § 221 (2d Ed. 1969); Annotation, 2 A.L.R.2d 943 § 16 (1948). In each case the key element is that the insurer made a good faith determination upon the factual question of insurability. It does not appear that *Elliott* contemplated a rejection of the application in bad faith, solely because of the applicant's death prior to approval by the company, where the applicant would have been insurable had he lived. If it were otherwise, this court could not understand why the Supreme Court indicated that no authorized officer *ever* found, nor any other evidence indicated, that *Elliott* was an insurable risk: it would have been sufficient to state, simply, that no decision

had been made either way *prior to Elliott's* death.

In opposition to defendant's motion for summary judgment, plaintiff relies upon Wright v. Pilot Life Ins. Co., 379 F.2d 409 (4th Cir. 1967) rev'd (a decision of this court) 254 F.Supp. 1018 (W.D.Va.1966), which, although applying North Carolina law, is very similar on its facts. In that case, *Wright*, plaintiff's decedent, completed the application, paid the first premium and received a "Conditional Receipt". The receipt acknowledged payment of the premium and recited that if the application were declined by the company, no policy of insurance would issue, but if " 'the application is approved, without restrictions, as applied for, the insurance will be in effect from the date of this application in accordance with its terms and conditions . . .' " (Emphasis added by the court). The court further reviewed the application:

> The reverse side of the "Conditional Receipt" is to be completed by those who, unlike Wright, do not make settlement for the initial premium with their application. It informs the applicant, who may subscribe to the statement, that "(a)lthough the agent has explained to me how I may make settlement under this application, *thereby placing it immediately in full force and effect * * * * * pro-*vided I am insurable, it is not my desire to take advantage of this opportunity". (Emphasis added by the court)

*Wright* died before the application had been acted upon. The Fourth Circuit held, nevertheless that a contract for temporary insurance, covering *Wright* at the time of his death, existed if in fact *Wright* was insurable on the date of the application. The court therefore remanded the case and directed this court to submit the issue of insurability to a jury.

Two points in *Wright* are particularly significant. First, the insurer, having accepted the premium, may not decline

to issue a policy unless it has a good reason for doing so, other than a wish to avoid payment. 379 F.2d at 411–412. The applicant's intervening death, therefore, is not a sufficient reason. Second, completion of a medical examination, and presumably the submission of all relevant information requested by the company before the intervening casualty is not an absolute condition precedent to completion of the application.

■ The court feels the proper view in these circumstances, then, is that if a conditional receipt of the type here is issued and the insurer has notice of the applicant's death before approval or rejection of the application, the insurer, in order to avoid liability, must be prepared to demonstrate that it rejects the application on the grounds that by its own health standards the applicant was not insurable for the proposed policy. This does not mean that all rejected applicants may have judicial review of the reasons for their rejection. This rule shall apply only where the casualty (death) which is sought to be insured against occurs, and the insurer has notice thereof, prior to rejection of the application.

The issue now becomes whether Evers was insurable at the time he paid the premium. The defendant company indeed continued its investigation of his application after learning of his death, and in its letter of November 25, advised that it was rejecting the application because Evers was not an insurable risk under the policy for which he had applied. To the court the evidence does not indicate that the company demonstrated bad faith with respect to Evers'

application, but there are suggestions that the medical evidence upon which the rejection was based was incomplete. On December 3, 1970, agent Masinter wrote to a company officer, noting that there were additional medical reports available. Apparently they were not considered, although Martin L. Rein, defendant's First Executive Vice-President, deposed during these proceedings that the company would be willing to review such reports.[2]

■ Under these circumstances, the court feels that the issue of Evers' insurability according to the particular policy applied for, to be determined by the company's own standards and practices, should be submitted to a jury for consideration. Wright v. Pilot Life Ins. Co., 379 F.2d at 412. Those standards may be arbitrary or unreasonable as judged by "industry" standards, but so long as those standards are applied evenly and equitably to all applicants of defendant company who have become entitled to rely upon the "Conditional Receipt" by agreeing to its terms, the same must be respected.

The teachings of *Wright* in which this District Court was reversed in 1967 opened new and far-reaching roads of liability for insurance companies. Although we may respectfully disagree with the holding, nevertheless we bow to it, and that prompts us to let the jury speak under proper instructions.

What effect *Elliott* (decided by the Supreme Court of Virginia in 1970) will have on this type of claim remains to be determined. Obviously, the teachings of *Elliott* are not in accord with the *Wright* decision. Thus we have some-

2. In the deposition of Martin L. Rein on January 27, 1972, the following *inter alia* was adduced:
Q. (Attorney for plaintiff): What was the nature of these conversations? (with Mr. Masinter)
A. Mr. Masinter expressed the view that our decision was based on incomplete medical history, and that there was more current medical history available.
  I told Mr. Masinter that we would be glad to review any additional medical

information that he or anyone else would like to submit on behalf of Mr. Evers or Mr. Evers' beneficiary.
Q. Did that mean that if evidence could be supplied that Mr. Evers was an insurable physical risk at the time he applied for the insurance, that you might re-evaluate your judgments?
A. The way you phrased the question, the answer is yes.

what of a conflict in views between the federal and state courts, and this court, with misgivings, follows *Wright*.

For the foregoing reasons, it is therefore ordered that defendant's motion for summary judgment is hereby denied.

The court is of the opinion that this decision and order entered herein involve a controlling question of law as to which there is a substantial ground for difference of opinion, and that an immediate appeal from the decision and order may materially advance the ultimate determination of this litigation, pursuant to the provisions of Title 28 U.S.C. sec. 1292(b). An Appeal is granted.